597 F.2d 798
 Herbert FEDERMAN et al., Plaintiffs,
v.
EMPIRE FIRE AND MARINE INSURANCE COMPANY et al., Defendants-Appellees,
and
Stuart C. Goldberg and Jacob Aschkenasy, Additional
Defendants on Cross-Claims,
Stuart C. Goldberg, Additional Defendant on Cross-Claims, Appellant.
 No. 273, Docket 77-7232.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 23, 1977.
Decided April 2, 1979.
 
 Harry E. Youtt, Thal & Youtt, New York City, for appellant.
 Robert E. Meshel, D'Amato, Costello & Shea, New York City, for appellees Sitomer, Sitomer & Porges, et al.
 Susan S. Belkin, New York City (Aranow, Brodsky, Bohlinger, Benetar & Einhorn, Anthony L. Tersigni and George Berlstein, New York City, of counsel), for defendants-appellees Empire Fire and Marine Ins. Co., Gary O. Gross and Yale J. Kaplan.
 Harold Davis, Davis & Davis, New York City, for additional defendant Jacob Aschkenasy.
 Before LUMBARD, WATERMAN and VAN GRAAFEILAND, Circuit Judges.
 WATERMAN, Circuit Judge:
 
 
 1
 On May 31, 1972, Empire Fire and Marine Insurance Company, pursuant to a registration statement and prospectus filed with the Securities and Exchange Commission (SEC), made a public offering of 500,000 shares of common stock. The law firm of Sitomer, Sitomer & Porges (Sitomer) was retained by Empire to prepare the registration statement and prospectus for the offering. Stuart C. Goldberg, an attorney with the Sitomer firm, assisted to a limited extent in the preparation of the issue.
 
 
 2
 On May 2, 1973, plaintiffs,[1] Deitrich Meyerhofer and Herbert Federman, on behalf of themselves and all similarly situated purchasers, filed the original complaint in this consolidated action. The complaint alleged that the registration statement and prospectus under which Empire stock had been issued was false and misleading in that, among other things, it inflated the amount shown to be received from the offering for it did not disclose that the Sitomer firm was to receive a $200,000 finder's fee from the proceeds.[2] An amended complaint, identical in legal theory to the May 2 complaint, was served on June 5, 1973, in which violations of the Securities Act of 1933, the Securities Exchange Act of 1934, SEC Rule 10b-5, and common law negligence, fraud, and deceit were alleged.[3]
 
 
 3
 The factual basis underlying the alleged violations of the Securities Acts, and rules and regulations thereunder, related specifically to Empire's failure to disclose in the registration statement or prospectus the proposed fee arrangements between Empire and Sitomer.[4]
 
 
 4
 Named as defendants were Empire, and the officers and directors of Empire; the Sitomer firm and its three partners, A. L. Sitomer, S. J. Sitomer, and R. E. Porges; Faulker, Dawkins & Sullivan Securities Corporation (managing underwriter); Stuart C. Goldberg (an attorney with the Sitomer firm); and certain selling Empire shareholders.
 
 
 5
 The Empire defendants cross-claimed against the Sitomer defendants, and against Stuart C. Goldberg and Jacob Aschkenasy (both of whom worked on the Empire offering) as additional defendants, alleging negligence and malpractice in the preparation of the registration statement. Goldberg, in turn, counterclaimed against Empire and cross-claimed against Sitomer and Aschkenasy, alleging that they had conspired to violate the securities laws by failing to disclose the fee arrangement in the Empire registration, and Goldberg also charged that Sitomer and Aschkenasy, as co-conspirators with Empire, had knowingly and intentionally exposed him to liability under the securities laws by misrepresenting to him the nature of the fee arrangement.
 
 
 6
 In January 1976 a court-approved settlement disposed of all claims in the present controversy with the exception of the claims asserted by and against Goldberg. In December 1976 Goldberg's claims were dismissed with leave to amend. Goldberg filed an amended complaint and the remaining defendants moved for dismissal. On April 12, 1977, the district court entered an order denying without prejudice the defendants' motions to dismiss. The court retained jurisdiction over the case but suspended all further proceedings in federal court pending the commencement of actions in state court. Meyerhofer v. Empire Fire and Marine Ins. Co., 74 F.R.D. 151 (S.D.N.Y.1977). Goldberg appeals from this April 12, 1977, order.
 
 
 7
 This appeal represents but one episode in the unremitting litigation arising out of a 1972 public offering of stock, and as such, requires that we briefly review the events leading up to the district court's order and Goldberg's participation in those events.
 
 
 8
 Goldberg had been an attorney with the Sitomer firm from November 15, 1971, until he resigned from the firm in January of 1973, and he had developed an expertise in the area of securities law. He had participated to a limited extent in the preparation of the Empire issue, but another Sitomer associate had been primarily responsible for the issue. Work on the Empire S-1 Registration Statement began prior to Goldberg's arrival at the law firm, and his contribution to it had largely consisted of rendering legal opinions concerning the firm's obligation to report its fee. Amendment to Amended Answer, P 49(a), December 22, 1976. Goldberg asserts that in his effort to evaluate properly the firm's disclosure obligations he inquired whether the firm's fee was a fixed or contingent one, and that he was specifically informed by defendants Alvin Sitomer, Stephen Sitomer, and Robert Porges that the fee was not contingent. Id. at P 50(a). Goldberg states that, relying on the correctness of this information, he communicated with the SEC in order to obtain additional information from the Commission concerning the firm's disclosure obligations, and that he prepared a memorandum on January 24, 1972, covering the subject. Id. at P 51(a). During the early months of 1972 Goldberg was instructed to review the preliminary draft of the Empire registration with specific emphasis on Sitomer's purchase of Empire stock and the proper disclosure thereof. Id. at P 52(a). As part of his review Goldberg inquired as to whether the stock was fully paid for and unconditionally owned and was told in response to his inquiry that the stock was indeed fully paid for and unconditionally owned.
 
 
 9
 In connection with the Empire public offering Goldberg subsequently expressed concern over what he considered omissions in the Empire registration statement, specifically, the nondisclosure or inadequate disclosure of Sitomer's fee arrangement and the extent to which such excessive fees might include a finder's fee. The Empire registration statement and prospectus was filed with the SEC on March 28, 1972, and became effective on May 31, 1972. Goldberg's uneasiness over the excessive fee question in the Empire issue was not extinguished, however, upon the registration becoming effective. In fact, Goldberg's suspicions were rekindled on or about January 20, 1973, when the same question arose in connection with the Sitomer firm's fee arrangements with Glacier General Assurance Company (Glacier). Goldberg confronted the Sitomer defendants with the fruits of his personal investigation into the fee arrangement practice of the firm, whereupon said defendants admitted they had lied about the nature of the Empire fee and informed him that it was indeed a contingent arrangement, yet, they refused to make an immediate disclosure thereof. Id. at P 57(a). Goldberg's continued advocacy that full and complete disclosure of the fee arrangement in the Empire offering be forthwith made culminated in his resignation from the firm on January 22, 1973.[5] On the following day Goldberg met with SEC officials for the purpose of making a full disclosure of the methods of operation utilized in Sitomer's securities practice.[6] The information related to the SEC at this meeting was subsequently embodied in an affidavit prepared by Goldberg dated January 26, 1973.
 
 
 10
 Goldberg met with the attorneys for the plaintiffs, the firm of Bernson, Hoeniger, Freitag & Abbey, on at least two occasions, the first meeting taking place on May 3, 1973, one day after service of the original complaint. It was through these meetings that the Bernson firm was supplied with a copy of Goldberg's January 26 affidavit which tended to verify his lack of knowledge of the fee arrangement and of his concomitant nonparticipation in the omission of the information about the finder's fee in the prospectus. As a consequence of this, Goldberg was dropped as a party defendant.
 
 
 11
 After their receipt of the January 26 affidavit the plaintiffs amended their complaint so as to include more specific factual allegations, but the underlying legal theories were consistent with those contained in the original complaint.
 
 
 12
 As a result of the association between Goldberg and the Bernson firm the remaining defendants filed a motion pursuant to Canons 4 and 9 of the Code of Professional Responsibility,[7] the Disciplinary Rules and Ethical Considerations thereto, and the supervisory powers of the district court, seeking an order disqualifying Goldberg and the Bernson firm from acting as attorneys in the premises and from disclosing confidential information relative thereto. The district court (MacMahon, J.) by memorandum and order dated August 23, 1973, held that the Bernson firm and Goldberg were barred from acting as counsel or participating with counsel for plaintiffs in the originally filed Meyerhofer action or in any future action against Empire involving the underlying transactions in issue, and also from disclosing to others any relevant confidential information. The complaint was dismissed without prejudice.
 
 
 13
 On appeal, our court found that the association between Goldberg and the Bernson firm was not "tainted by violations of the Code of Professional Responsibility," Meyerhofer v. Empire Fire and Marine Ins. Co., 497 F.2d 1190, 1196 (2d Cir.), Cert. denied, 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 272 (1974), and that there was no proof "that Goldberg had revealed any information, confidential or otherwise, that might have caused the instigation of the suit," at 1194, and that in view of the serious charges surrounding the Empire issue Goldberg "had the right to make an appropriate disclosure with respect to his role in the public offering," at 1195. The portion of the district court's order dismissing the complaint and enjoining the Bernson firm from acting as counsel for plaintiffs was reversed. The portion of the lower court's order prohibiting Goldberg from acting as a "party or as an attorney for a party in any action arising out of the facts herein alleged" was affirmed, at 1196.
 
 
 14
 During the pendency of the Meyerhofer appeal the plaintiffs instituted a second action styled Federman v. Empire Fire and Marine Ins. Co., asserting essentially the same claims that were contained in the Meyerhofer action. Stuart C. Goldberg, however, was not named as a defendant in the Federman action. The two cases were later consolidated by order dated December 30, 1974.
 
 
 15
 On March 24, 1974, the Empire defendants served their answer, which in addition to various denials and affirmative defenses set forth five cross-claims.[8] The first four cross-claims were asserted jointly and severally against the Sitomer firm, its general partners, Stuart C. Goldberg, and Jacob Aschkenasy. As Goldberg and Aschkenasy were not previously parties to the litigation, they were brought into the action under Rule 13(h) of the Federal Rules of Civil Procedure as additional defendants on defendant Empire's cross-claims.[9] Summarized, the first and second cross-claims alleged that Empire relied on the Sitomer firm, its partners, Goldberg, and Aschkenasy as lawyers to prepare the public offering to ensure the legal sufficiency and completeness of the Empire registration statement, and Empire sought indemnification and contribution from them in the event that Empire incurred any liability. Empire based these claims on the theory that any Empire liability would have been caused by the negligence and malpractice of the cross-defendants in failing to ensure that the registration statement complied with applicable legal requirements. The third and fourth cross-claims sought reimbursement for all liabilities and expenses, including attorneys' fees, incurred as a result of the alleged negligence and malpractice of the cross-defendants.
 
 
 16
 The fifth cross-claim was asserted solely against the Sitomer firm. By it Empire sought the refund of all legal fees paid to the firm with reference to any services found to have been negligent or occasioned by malpractice.
 
 
 17
 Goldberg served his initial answer to Empire's cross-claims on May 27, 1974. In addition to denials and affirmative defenses to Empire's claims, he filed three cross-claims; one against Sitomer and its partners, jointly and severally, for indemnification, and two separate claims against Sitomer, its partners, and Aschkenasy for indemnification and contribution. Shortly thereafter, on June 16, 1974, he served an amended answer and added one claim, denominated as a counterclaim, for damages sought to be recovered against the Empire defendants, and added a cross-claim against Sitomer, its partners, and Aschkenasy, each for alleged damage to his reputation, for the loss of his employment, and for his attorney's fees.
 
 
 18
 The Empire defendants' response to Goldberg's counterclaim was served on June 25, 1974. It consisted of various denials and a single defense of legal insufficiency.
 
 
 19
 On August 22, 1975, all parties, with the exception of Goldberg, entered into a stipulation of settlement by which the Sitomer firm agreed to pay $650,000 and Empire agreed to pay $160,000 to a class settlement fund administered by plaintiffs' counsel. The settlement was approved by the district court. The settlement provided that all claims between and among the plaintiffs, defendants, and the additional defendant, Aschkenasy, would be dismissed on the merits with prejudice. The claims asserted by and against Goldberg were not included in the stipulation of settlement. The claims remaining unsettled were Empire's cross-claims against Goldberg and Goldberg's counterclaim against Empire and cross-claims against Sitomer and Aschkenasy.
 
 
 20
 Subsequent to the district court's approval of the settlement, the Empire defendants moved pursuant to Rules 12(c) and 12(h)(2) of the Federal Rules of Civil Procedure for judgment on the pleadings seeking the dismissal of Goldberg's counterclaim on the ground that the claim failed to state a claim upon which relief could be granted. In support of their motion, the Empire defendants asserted that, as a matter of law, Goldberg's claims were insufficient under New York law for the imposition of liability. At the same time that Empire interposed its Rule 12 motions Goldberg moved for an order of recusal and for transfer to another judge. The motion was denied after oral argument. Empire's Rule 12 motions were granted and Goldberg's counterclaim was dismissed with leave to amend on December 3, 1976.
 
 
 21
 Goldberg served an amendment to his amended answer on December 22, 1976. It contained two distinct causes of action in lieu of the four-paragraph counterclaim against Empire and cross-claim against Sitomer, its partners, and Aschkenasy. These were asserted as counterclaims against Empire and cross-claims against Sitomer, its partners, and Aschkenasy. They were claims for "injurious involvement"[10] which included a claim for medical expenses and claims for damages based upon fraud.[11] Also included in this amendment were two new cross-claims against the Sitomer firm for breach of warranty and fraud.[12]
 
 
 22
 Empire moved pursuant to Rule 12(b)(6) of the FRCP for an order dismissing each counterclaim on the ground that each claim failed to state a claim upon which relief could be granted because as a matter of law they were legally insufficient.
 
 
 23
 The district court (MacMahon, J.) determined the cross-claims and counterclaims asserted in Goldberg's most recent answer to raise questions of state law and held that as such they fell within the court's pendent jurisdiction because Goldberg's claims and the original plaintiffs' claims were derived from a common nucleus of operative fact and the federal claims were substantial. Relying on the general policy considerations underlying the exercise of pendent jurisdiction outlined by the Supreme Court in United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the district court declined to exercise its discretionary power to adjudicate the state law claims inasmuch as they presented primarily unprecedented, novel, and complex issues of state law. As stated by the district court: "The interest of judicial economy and convenience would not be served in this case by the retention of jurisdiction over the state claims because the federal claims have been eliminated from the case."[13] The district court's purported reliance on the Gibbs considerations was diminished, however, when contrary to the teachings of Gibbs[14] it denied Empire's motions to dismiss and retained jurisdiction suspending all further proceedings pending the commencement and final determination of an action in state court encompassing all state law claims, cross-claims, and counterclaims. This appeal followed.
 
 
 24
 * For the purposes of review we will treat Judge MacMahon's April 12 order denying Empire's motions to dismiss and the concomitant retaining of federal district court jurisdiction as an order of abstention which is a " final" order and therefore within this court's appellate jurisdiction. 28 U.S.C. § 1291 (1970); Indiana State Employees Association, Inc. v. Richard A. Boehning, 511 F.2d 834, 835 (7th Cir.), Rev'd on other grounds, 423 U.S. 6, 96 S.Ct. 168, 46 L.Ed.2d 148 (1975); Druker v. Sullivan, 458 F.2d 1272, 1273 (1st Cir. 1972). Although the district court's order was couched in terms of pendent jurisdiction and the discretionary exercise thereof, the practical effect of such an order, irrespective of technical nomenclature, was the postponement of any exercise of federal jurisdiction awaiting state court adjudication of questions of state law.[15] In arriving at its decision to exercise its power of abstention the district court erroneously predicated federal jurisdiction on its finding that the state law claims were within its pendent jurisdiction.
 
 II
 
 25
 Pendent jurisdiction developed largely as a result of problems facing federal courts due to the existence of parallel state and federal claims. It became increasingly evident that, in order for federal courts to exercise even limited jurisdiction, they must hear certain state claims.[16] The concept of pendent jurisdiction as outlined by the Supreme Court in United Mine Workers v. Gibbs, supra, permitted the adjudication of state claims in conjunction with federal claims between the same parties if the state and federal claims derive from a common nucleus of operative fact or are of such a nature that the parties would normally be expected to try them in one judicial proceeding. United Mine Workers v. Gibbs, supra. Therefore, when the relationship between the state and federal claims permitted the conclusion that the whole action was really one claim under the Constitution, laws, or treaties of the United States, adjudication of a nonfederal claim by a federal court was justified under article III, section 2 of the United States Constitution.[17]
 
 
 26
 Application of the doctrine of pendent jurisdiction is discretionary; it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law. United Mine Workers v. Gibbs, supra. Dismissal of the state claim is the recommended procedure if state issues predominate or jury confusion is likely due to divergent legal theories, and in cases where the federal claim is disposed of prior to trial. United Mine Workers v. Gibbs, supra; Nolan v. Meyer, 520 F.2d 1276 (2d Cir.), Cert. denied,423 U.S. 1034, 96 S.Ct. 567, 46 L.Ed.2d 408 (1975); Kavit v. A. L. Stamm & Co., 491 F.2d 1176 (2d Cir. 1974); Yanity v. Benware, 376 F.2d 197 (2d Cir.), Cert. denied, 389 U.S. 874, 88 S.Ct. 167, 19 L.Ed.2d 158 (1967); T. B. Harms Co. v. Eliscu, 339 F.2d 823 (2d Cir. 1964), Cert. denied, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965). Here the district court weighed these factors and found that the likelihood of prejudice to Goldberg due to the possible running of the state statute of limitations necessitated retention of jurisdiction under the doctrine of pendent jurisdiction.[18]
 
 
 27
 The district court was correct in considering this factor, and its retention of jurisdiction instead of dismissing the state claims cannot be considered an abuse of discretion. The district court did, however, err in finding A fortiori that because the state and federal claims arose out of a common nucleus of operative fact they were necessarily within the court's pendent jurisdiction.
 
 
 28
 Pendent jurisdiction as defined in Gibbs applies to state law claims which are joined in the complaint with federally cognizable claims and which are asserted by the original plaintiff against the original defendant. United Mine Workers v. Gibbs, supra; Blake v. Pallan, 554 F.2d 947, 956 n. 11 (9th Cir. 1977). It is the combination of state and federal claims in a complaint that gives rise to the doctrine of pendent jurisdiction. On the other hand, when, subsequent to the filing of the complaint, a party other than the original plaintiff injects state claims into a controversy as counterclaims, cross-claims, or third-party claims, such claims fall within the court's ancillary jurisdiction rather than its pendent jurisdiction.
 
 III
 
 29
 The concept of ancillary jurisdiction allows a district court once it has acquired jurisdiction over a case or controversy to decide matters incident to the main claim which otherwise could not be asserted independently. It is invoked to avoid piecemeal litigation which might occur due to the irreconcilability between article III limits on jurisdiction and the permissive rules of joinder adopted by the Federal Rules of Civil Procedure. United States v. United Pacific Ins. Co., 472 F.2d 792 (9th Cir.), Cert. denied, 411 U.S. 982, 93 S.Ct. 2273, 36 L.Ed.2d 958 (1973). The scope of ancillary jurisdiction is not well defined and its application requires a consideration of factors similar to those consulted when exercising pendent jurisdiction.
 
 
 30
 The concept of ancillary jurisdiction has supported non-federal claims having relation to property under a federal court's control as in bankruptcy proceedings. Steelman v. All Continent Corp., 301 U.S. 278, 57 S.Ct. 705, 81 L.Ed. 1085 (1937); Samuel C. Ennis & Co., Inc. v. Woodmar Realty Co., 542 F.2d 45 (7th Cir. 1976), Cert. denied, 429 U.S. 1096, 97 S.Ct. 1112, 51 L.Ed.2d 543 (1977). State claims incidental to a receivership established by a federal court come within the scope of a federal court's ancillary jurisdiction. Tcherepnin v. Franz, 485 F.2d 1251 (7th Cir. 1973), Cert. denied, 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974); Esbitt v. Dutch-American Mercantile Corp., 335 F.2d 141 (2d Cir. 1964); Riehle v. Margolies, 279 U.S. 218, 49 S.Ct. 310, 73 L.Ed. 669 (1929), as well as acts undertaken by a federal court to protect and/or effectuate its judgments. Dugas v. American Surety Co., 300 U.S. 414, 57 S.Ct. 515, 81 L.Ed. 720, Rehearing denied, 301 U.S. 712, 57 S.Ct. 787, 81 L.Ed. 1365 (1937) (protect); Martina Theatre Corp. v. Schine Chain Theatres, Inc., 278 F.2d 798 (2d Cir. 1960) (effectuate).
 
 
 31
 The required nexus between the underlying federal jurisdiction-conferring claim and a non-federal counterclaim or cross-claim is not altogether clear. The leading case for the determination of ancillary jurisdiction over counterclaims (under Equity Rule 12) is Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). The Supreme Court in Moore sanctioned the retention of jurisdiction over the defendant's non-federal counterclaim notwithstanding the dismissal on the merits of the plaintiff's jurisdiction-conferring claim. The Court held that:
 
 
 32
 So close is the connection between the case sought to be stated in the bill and that set up in the counterclaim, that it only needs the failure of the former to establish the latter; but the relief afforded by the dismissal of the bill is not complete without an injunction restraining appellant from continuing to obtain by stealthy appropriation what the court held he could not have by judicial compulsion.[19]
 
 
 33
 Therefore, when parties to an action have conflicting state and federal claims arising out of the same transaction a federal court has ancillary jurisdiction to decide All claims, thereby avoiding the potential for piecemeal litigation. The general rule as applied to counterclaims is that a federal court has ancillary jurisdiction over compulsory counterclaims since by their definition they arise out of the same transaction or occurrence that is the subject matter of the opposing party's claim. Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 468 n. 1, 94 S.Ct. 2504, 2506, 41 L.Ed.2d 243 (1974); Mayer Paving & Asphalt Co. v. General Dynamics Corp., 486 F.2d 763 (7th Cir. 1973), Cert. denied, 414 U.S. 1146, 94 S.Ct. 899, 39 L.Ed.2d 102 (1974); United States v. Heyward-Robinson Co., 430 F.2d 1077 (2d Cir. 1970), Cert. denied, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971); Dery v. Wyer, 265 F.2d 804 (2d Cir. 1959); Lesnik v. Public Industrials Corp., 144 F.2d 968, 976 n. 10 (2d Cir. 1944); Kaumagraph Co. v. General Trade Mark Corp., 12 F.Supp. 230 (S.D.N.Y.1935), Aff'd per curiam, 102 F.2d 992 (2d Cir. 1939). The same rule for determining ancillary jurisdiction over compulsory counterclaims holds true for cross-claims pursuant to Rule 13(g) of the Federal Rules of Civil Procedure.[20]
 
 
 34
 Evaluating the cross-claims and counterclaims asserted in the present controversy in the light of these general principles, we find that Empire's cross-claims seeking contribution, indemnity, and damages were properly within the district court's ancillary jurisdiction inasmuch as they arose out of the same transaction that was the subject matter of the original complaint. Rule 13(g) specifically sanctions claims between coparties for contribution and indemnity such as those asserted by Empire. The entry of the stipulation of settlement resulted in prejudicial dismissal on the merits of Empire's cross-claims against codefendant Sitomer and additional defendant Aschkenasy. Empire's cross-claims against Goldberg for contribution and indemnity merit the same disposition in view of the fact that the settlement eliminated the underlying jurisdictional bases for such claims. The stipulation of settlement also necessitates dismissal of Empire's remaining cross-claims against Goldberg for damages and reimbursement, this being the recommended procedure when the jurisdiction-conferring claim is dismissed prior to trial. United Mine Workers v. Gibbs, supra; Nolan v. Meyer, supra; Kavit v. A. L. Stamm & Co., supra; Yanity v. Benware, supra; T. B. Harms Co. v. Eliscu, supra. The fact that the federal claim was dismissed pursuant to a settlement rather than by judicial determination does not justify the application of a different rule. The district court therefore erred in retaining jurisdiction over Empire's cross-claims in the absence of a federal jurisdiction-conferring claim.
 
 
 35
 Having disposed of the state claims asserted Against Goldberg, we now address the state law claims asserted By him. Goldberg's most recent amended answer contained four state law claims. The claims for injurious involvement and fraud were denominated as counterclaims against Empire and cross-claims against the Sitomer defendants. The two remaining claims for breach of warranty and fraud took the form of cross-claims against only the Sitomer defendants.
 
 
 36
 Inasmuch as the test for determining the scope of ancillary jurisdiction over counterclaims and cross-claims is synonymous with the Rule 13(a) test for defining compulsory counterclaims, the application of this standard to Goldberg's claims will be determinative of the issue of ancillary jurisdiction. The absence of any accepted test for the determination of whether a claim is compulsory as opposed to permissive has resulted in reliance on numerous tests, all of which tend to support the conclusion that the counterclaim arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim.[21] The factors most generally considered by these tests as indicators of the compulsory nature of a claim are: (1) identity of facts between original claim and counterclaim; (2) mutuality of proof; (3) logical relationship between original claim and counterclaim. Although these factors or tests may be indicative in one sense or another of the compulsory character of a counterclaim, no one of them is conclusive, and should not be relied on exclusively.
 
 
 37
 While it is true that Goldberg's counterclaims for injurious involvement and fraud (also cross-claims) bear some factual relationship to the original claim for securities fraud, it cannot be said that they arise out of the same transaction or occurrence for the purpose of invoking ancillary jurisdiction. First, Goldberg's claims, which raise unprecedented questions of tort law, contract law, and warranties, go far beyond the purview of the plaintiff's claims seeking relief because of defendants' violations of the securities and exchange acts. Secondly, a mere Sine qua non relationship between Goldberg's alleged injury and the underlying securities violations is insufficient to satisfy the required nexus which gives rise to a compulsory counterclaim. Additionally, the quantum of proof required to establish the allegations of the original complaint would fall far short of the proof required to support Goldberg's claims.[22] For example, Goldberg concedes that proof of his damages as a result of his alleged injurious involvement will include events which occurred more than one year after the public offering. Lastly, the factual basis of Goldberg's claims for damages concerns primarily events subsequent and unrelated to the alleged omissions in the registration statement and prospectus, and cannot be found to arise out of the same transaction or occurrence.
 
 
 38
 In view of the dissimilarities between Goldberg's counterclaims and the original claim, we find that the counterclaims are not compulsory as defined by Rule 13(a) and, therefore, were not automatically within the scope of the district court's ancillary jurisdiction. Baker v. Gold Seal Liquors, Inc., supra; Lesnik v. Public Industrials Corp., supra; Mayer Paving & Asphalt Co. v. General Dynamics Corp., supra; cf. United States v. Heyward-Robinson Co., 430 F.2d 1077, 1088 (2d Cir. 1970), Cert. denied, 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971) (concurring opinion, Friendly, C. J.). Goldberg's counterclaims are therefore permissive counterclaims only, and the district court may not exercise its ancillary power of jurisdiction over them unless there exists some independent jurisdictional base such as the existence of a federal question upon which federal jurisdiction may be founded. Aldens, Inc. v. Packel, 524 F.2d 38 (3d Cir. 1975), Cert. denied, 425 U.S. 943, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); Polorn Products, Inc. v. Lybrand, Ross Bros. & Montgomery, 66 F.R.D. 610 (S.D.N.Y.), Rev'd on other grounds, 534 F.2d 1012 (2d Cir. 1975).
 
 
 39
 Federal question jurisdiction under 28 U.S.C. § 1331 is unavailable because Goldberg's claims raise issues of state law and are only peripherally related to the federal securities statutes.[23] Absent any jurisdictional base the district court was without jurisdiction, ancillary or otherwise, and Goldberg's counterclaims should have been dismissed for lack of jurisdiction.
 
 
 40
 The foregoing analysis of Goldberg's counterclaims applies with equal force to his cross-claims against Sitomer, inasmuch as the Rule 13(a) test for determining a compulsory counterclaim is identical to the Rule 13(g) test for cross-claims. Therefore, our finding that Goldberg's counterclaims for injurious involvement and fraud were permissive rather than compulsory precludes consideration of them as cross-claims against Sitomer. As to the remaining cross-claims against Sitomer for breach of warranty and fraudulent inducement in continuation of employment, we find that these claims clearly do not arise out of the same transaction or occurrence which was the subject matter of the original complaint; and, that being the case, they do not come within the definition of cross-claims contained in Rule 13(g). The independent quality of Goldberg's remaining claims not only renders them inappropriate as cross-claims, but also destroys their ancillary character which in turn prohibits the exercise of federal jurisdiction. Goldberg's cross-claims as well as his counterclaims must be dismissed for lack of jurisdiction.
 
 
 41
 Inasmuch as the district court was without jurisdiction to hear Goldberg's claims, its decision to abstain pending state court adjudication was in error. The exercise of abstention power by a federal court assumes a case properly within the jurisdiction of the federal court, because abstention necessarily involves discretion to postpone or decline to exercise federal jurisdiction. Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); England v. Louisiana State Bd. of Med. Exam., 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964); Williams v. Murdock, 350 F.2d 840 (3d Cir. 1965).[24]
 
 
 42
 Reversed and remanded with instructions to dismiss all cross-claims and counterclaims.
 
 
 43
 LUMBARD, Circuit Judge, concurs in the result.
 
 
 
 [1]
 Plaintiff Meyerhofer, on or about January 4, 1973, purchased 100 shares of Empire stock at $17.00 a share, for a net consideration of $1,734.10 (including commissions). He alleged in the amended complaint dated June 5, 1973, that his 100 shares had a market value of only.$7.00 a share, thereby resulting in an unrealized loss of $1,000.00. Meyerhofer v. Empire Fire and Marine Insurance Co., 497 F.2d 1190, 1192 (2d Cir.) Cert. denied, 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 272 (1974) (Opinion of Judge Moore citing Plaintiffs' Amended Complaint P 9a)
 The amended complaint alleged that plaintiff Federman, on or about May 31, 1972, purchased 200 shares of Empire common stock at a purchase price of $16.00 per share for a net consideration of $3,200.00. One hundred shares were sold by Federman on August 19, 1972, for an aggregate price of $1,329.04 resulting in a realized loss of approximately $270.00. Plaintiffs' Amended Complaint, P 8(a), June 5, 1973. On the stock retained, Federman sustained an unrealized loss of approximately $900.00. Meyerhofer v. Empire Fire and Marine Insurance Co., 497 F.2d 1191, 1192 (2d Cir.), Cert. denied, 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 272 (1974) (opinion of Judge Moore citing Plaintiffs' Amended Complaint).
 There is no question under these factual circumstances that the plaintiffs complied with the purchaser-seller standing requirement of Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), which was recently given a new lease on life in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1976), and therefore established a prima facie case for securities laws violations.
 
 
 [2]
 The complaint charged:
 
 
 [7]
 The registration statement and the prospectus were materially false and misleading in that:
 (a) Defendants knew that additional fees of $200,000 would be paid to the Sitomer firm and that therefore such estimated expenses (which were estimated at $200,000) would actually be $400,000 and should have been disclosed as such.
 (b) The registration statement and prospectus failed to disclose that Empire had agreed to pay the Sitomer firm $200,000 in cash, that the said law firm was receiving as part of its compensation approximately $38,439 in guaranteed cash profits on the secondary offering from sale of part of the Empire stock it purchased at a bargain price and would receive an increase of approximately $167,000 in value of the Empire stock it retained, all of which consideration was paid to the said law firm as a finder's fee. The registration statement and prospectus failed to disclose the said payment and amount of the compensation paid to the Sitomer firm and the fact that the compensation was paid in return for finders and related services.
 (c) Defendants knew that the net proceeds described in the registration statement and prospectus as $5,090,000 from the sale of 355,773 shares of Empire's common stock was overstated by $200,000, since an additional $200,000 fee was to go to the Sitomer firm.
 (d) The registration statement and prospectus failed to disclose that the sale of stock of the Sitomer firm was not a pure sale of stock but rather was part of a compensation arrangement providing a finder's fee or similar compensation contingent upon a successful public offering and that the $38,439 in realized gain and approximately $167,000 gain by way of appreciation in value of retained stock was an additional finder's fee because Empire had guaranteed the loan by which the Sitomer firm obtained the proceeds required to acquire the Empire stock and as a result the Sitomer firm was guaranteed windfall profits upon the completion of the public offering.
 (e) The prospectus failed to disclose that $200,000 of the fees to be paid to the Sitomer firm was contingent upon a successful public offering of Empire stock.
 (f) The actual date of the acquisition by the Sitomer firm of its common stock was December 20, 1971 and was back-dated in order to avoid disclosure required by Item 25 of Form S-1 under the Securities Act of 1933.
 (g) The use of the proceeds section of the prospectus failed to disclose that $200,000 of the proceeds of the offering would be used as a finder's fee to the Sitomer firm.
 Plaintiffs' amended complaint, P 7, June 5, 1973.
 
 
 [3]
 The specific sections of the securities acts relied upon by plaintiffs were §§ 11, 12, and 22 of the Securities Act of 1933 (15 U.S.C. §§ 77k, 77L, and 77v (1970)) and §§ 10(b) and 27 of Securities Exchange Act of 1934 (15 U.S.C. §§ 78j and 78aa (1970)) and the rules of the SEC promulgated thereunder (15 U.S.C. § 78d-1 (1970))
 
 
 [4]
 The lawsuit was apparently inspired by a form 10-k which Empire filed with the SEC on or about April 12, 1973. The form revealed that the Registration Statement under the Securities Act of 1933 with reference to the May 31, 1972, public offering of 500,000 shares of common stock did not disclose the proposed $200,000 payment to the Sitomer firm, as well as other compensation agreements between Empire and Sitomer. In the latter part of April 1973 Empire distributed to its shareholders a proxy statement and annual report which had like omissions. Meyerhofer v. Empire Fire and Marine Insurance Co., 497 F.2d 1191, 1192 (2d Cir.), Cert. denied, 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 272 (1974)
 
 
 [5]
 Goldberg charges in his amended answer of December 22, 1976, that defendants Empire and Sitomer, in violation of the reporting and disclosure obligations under the Securities laws, were engaged in a conspiracy to conceal the information relative to the finder's fee and stock option purchase understanding they had. Amendment to Amended Answer, P 46(a), December 22, 1976. In furtherance of this conspiracy Goldberg alleges that Empire concealed the fee agreement and stock take-out letter, attempted to destroy copies of the fee agreement, and approved and authorized the filing of the Empire S-1 Registration Statement and prospectus without setting forth the necessary reports and disclosures concerning the nature of the legal fees paid to Sitomer. Id. at P 48(a)
 Goldberg also charges that in furtherance of the conspiracy Sitomer not only misrepresented the contingent nature of the fee and stock option purchase, but also devised a cover-up scheme which included the destruction of certain client files, the creation of new client files, and the concealment of the Empire written guarantee and take-out letter. The cover-up scheme also involved the creation of an elaborate story to excuse and justify the similar finder's fee arrangement with Glacier by perjuriously swearing that there were no similar agreements. Id. at P 58(a).
 Goldberg further alleges that, when he refused to be a party to the cover-up, defendant Stephen Sitomer threatened "that if (he) were to go to the S.E.C., the Law Firm defendants would use (his) memorandum of January 24, 1972, to make it appear contrary to fact that he had engineered the entire scheme to conceal the finder's fee." Id. at P 58(a). Goldberg thereupon resigned from the firm and reported to the SEC the information that Sitomer was to receive a finder's fee from Empire. Id. at P 59(a).
 
 
 [6]
 Goldberg worked on the Glacier registration as well as the Empire registration, and the finder's fee question raised by the Glacier issue was apparently the impetus for Goldberg's resignation and disclosure to the SEC. The disclosures made by Goldberg, although they related to the Empire issue, were actually precipitated by the Glacier issue, and hence it could be argued that Goldberg's claim for damages for the loss of his employment and for loss of wages arises more appropriately out of the conduct of the parties in connection with the Glacier registration rather than the events connected with the Empire registration. This argument is mentioned only to demonstrate the noncompulsory nature of Goldberg's claims as they relate to the claims of the original plaintiffs, which were based upon the false and misleading information contained in the Empire registration statement and prospectus. See textual discussion of compulsory counterclaims Infra
 
 
 [7]
 Code of Professional Responsibility Canon 4: A Lawyer Should Preserve the Confidence and Secrets of a Client
 Code of Professional Responsibility Canon 9: A Lawyer Should Avoid Even the Appearance of Professional Impropriety.
 
 
 [8]
 The claims asserted by Empire against codefendant Sitomer and additional defendants Goldberg and Aschkenasy were all cross-claims within the definition of Rule 13(g) of the Federal Rules of Civil Procedure. Rule 13(g) states:
 A pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action. Such cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant.
 
 
 [9]
 Federal Rule of Civil Procedure 13(h) provides that, "(p)ersons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20."
 Goldberg contends because neither he nor Aschkenasy were parties to the original action that Empire's claims against them fall under the definition of third-party claims as set forth in Rule 14. Rule 14 provides:
 At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him . . .
 If Empire's claims had been asserted solely against Goldberg and Aschkenasy as new parties, Rule 14 would apply and the claims would be third-party claims; however, as Empire's claims are directed against codefendant Sitomer as well as additional defendants Goldberg and Aschkenasy, they fall squarely within the joinder provisions of Rule 13(h) regarding the addition of parties to a cross-claim.
 We find it noteworthy that until argument upon appeal Goldberg considered himself an additional defendant on Empire's cross-claim rather than a third-party defendant. (See Goldberg's Amendment to Amended Answer, December 22, 1976.)
 
 
 [10]
 The factual basis underlying Goldberg's "injurious involvement" cause of action related to an alleged conspiracy between Empire and Sitomer (including additional defendant Aschkenasy) to violate the securities laws, regulations, and criminal statutes by filing a fraudulent registration statement with the SEC, and fraudulently offering Empire securities to the public by concealing the character, nature, and details of certain legal fee arrangements which provided for the payment of fees to Sitomer on a contingency basis depending upon the success of the public offering of Empire securities. Goldberg alleged that the conspiracy also involved the concealment of information regarding the conditional nature of a Sitomer purchase of Empire stock
 He alleged that in furtherance of said conspiracy and with the knowing acquiescence of Empire, Sitomer falsely represented to him in response to inquiries he propounded that the Empire fee was fixed and not contingent. Goldberg further charged that Sitomer deliberately concealed the true facts knowing that the natural and probable result of such concealment would be the exposure of Goldberg to substantial harm and damage in the event the conspiracy to violate the securities laws was uncovered, for it would then be clearly foreseeable that he would be mistakenly implicated in the violations. Therefore, Goldberg alleged that, as a direct and immediate consequence of the defendants' scheme to violate the securities laws by failing to disclose the finder's fee and conditional stock purchase, he suffered damages, to wit:
 (1) loss of employment, resulting in loss of income totaling $16,187 and impairment of earnings totaling $850,000;
 (2) termination as front page by-line securities columnist;
 (3) legal fees in excess of $3,965 relating to an SEC investigation;
 (4) legal fees in excess of $8,174.39 to defend present action by virtue of his status as an additional defendant;
 (5) legal fees (pro bono) of $10,610, and expenses of $216.54 relating to the case of Meyerhofer v. Empire Fire and Marine Insurance Co., 497 F.2d 1191 (2d Cir.), Cert. denied, 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 272 (1974);
 (6) as a result of his association with the conspiracy he has incurred
 (a) substantial damage to his reputation, personal and professional, in the amount of $150,000;
 (b) severe mental and emotional pain in the amount of $1,000,000;
 (c) physical pain and suffering from an asthmatic condition triggered by emotional strain in the amount of $10,000;
 (d) medical expenses in the amount of $610.
 Goldberg's Amendment to Amended Answer P 41a-60a, December 22, 1976.
 
 
 [11]
 Goldberg's claim for "fraud" realleged the factual basis of the claim for "injurious involvement" and sought the same damages. Goldberg's Amendment to Amended Answer P 61a-66a, December 22, 1976
 
 
 [12]
 The cross-claims asserted by Goldberg against Sitomer were for (1) breach of warranty; and (2) fraudulent inducement in continuation of employment. They, too, rest on basically the same factual bases as the claims for injurious involvement and fraud set out previously. Goldberg's Amendment to Amended Answer P 67a-72a (breach of warranty); P 73a-74a (fraudulent inducement), December 22, 1976
 
 
 [13]
 Meyerhofer v. Empire Fire and Marine Insurance Co., 74 F.R.D. 151, 153 (S.D.N.Y.1977)
 
 
 [14]
 United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Supreme Court in addressing the scope of pendent jurisdiction stated:
 Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. (footnotes omitted) (emphasis added). Id. at 726-27, 86 S.Ct. at 1139.
 
 
 [15]
 Finality is given a practical rather than technical construction. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 171, 94 S.Ct. 2140, 2149, 40 L.Ed.2d 732 (1974); Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). A final decision for the purposes of appeal is not necessarily the last order possible in a case. Gillespie v. United States Steel Corp., 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964)
 Insofar as the present case raises neither a constitutional issue, Railroad Comm. of Texas v. Pullman, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); nor a potential interference with a state criminal prosecution, Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); nor a predominant state interest, Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, Rehearing denied, 320 U.S. 214, 63 S.Ct. 1442, 87 L.Ed. 1851 (1943); we assume for the purposes of this appeal that the district court's stay of its hand was based upon Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).
 
 
 [16]
 The federal judiciary recognized early the necessity of hearing state claims in order effectively to exercise federal jurisdiction. This culminated in the development of the doctrines of pendent and ancillary jurisdiction. Justice Marshall in Osborn v. Bank of the United States, 22 U.S. 326 (9 Wheat. 738) 6 L.Ed. 204 (1824), recognized the necessity for such a doctrine to insure that the federal courts as a practical matter could function, and stated:
 when a question to which the judicial power of the Union is extended by the constitution, forms an ingredient of the original cause, it is in the power of congress to give the circuit courts jurisdiction of that cause, although other questions of fact or law may be involved in it.
 
 
 [9]
 Wheat. at 823
 
 
 [17]
 United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Jurisdiction under article III, section 2, would also be properly exercised when the state claim was closely tied to federal policy. Id. at 727. See United States v. P. J. Carlin Construction Co., 254 F.Supp. 637 (E.D.N.Y.1966)
 Following this line of reasoning, Goldberg argues that the state law issues raised by the parties in the case Sub judice involve significant issues of federal securities policy as that policy affects the duties of lawyers and the protection of the rights of lawyers who perform their duties; therefore, due to the significant federal interest in properly supervising the activities of the federal securities bar, these issues arise under federal law and are within the district court's jurisdiction pursuant to 28 U.S.C. § 1331. Although courts have recognized the extension of pendent jurisdiction to state claims intimately involved with federal policy, the extension of federal jurisdiction urged by Goldberg is without precedent and would result in an unwarranted extension of federal jurisdiction.
 
 
 [18]
 Meyerhofer v. Empire Fire and Marine Insurance Co., 74 F.R.D. 151, 154 (S.D.N.Y.1977). After discussing Gibbs and the necessity for dismissal, the district court found, however, that retention of jurisdiction was required in view of the potential bar of the New York statute of limitations:
 If plaintiff is now relegated to the state court, he may be confronted with a statute of limitations problem, although this is unclear because it is uncertain what statute of limitations applies. Under these circumstances, we think plaintiff should retain the same right to prosecute this action in state court that he would have had if we had permitted the case to proceed here. It would work a harsh injustice upon plaintiff Goldberg if we were to dismiss his claims and it was later determined that he was barred by the statute of limitations because of the time that had elapsed while the case was before us.
 Id. at 154.
 Yet, as recognized by the district court, there is a strong possibility that Goldberg's assertion of his state law claims in the federal district court for the Southern District of New York tolled the state statute of limitations by virtue of section 203(d) of the Civil Practice Law and Rules. McKinney's CPLR § 203(d) (1972). Section 203(d) states:
 Where a defendant has served an answer containing a defense or counterclaim and the action is terminated because of the plaintiff's death or by dismissal or voluntary discontinuance, the time which elapsed between the commencement and termination of the action is not part of the time within which an action must be commenced to recover upon the claim in the defense or counterclaim or the time within which the defense or counterclaim may be interposed in another action brought by the plaintiff or his successor in interest.
 See Meyerhofer v. Empire Fire and Marine Insurance Co., 74 F.R.D. 151, 154 n. 11 (S.D.N.Y.1977). The district court also referred to sections 203(d) and 205(a) or (b) of the Civil Practice Law and Rules as having a possible tolling effect.
 And, of course, Goldberg could have proceeded in the state courts by initiating an action there while his case remained Sub judice in the federal courts.
 
 
 [19]
 Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 371, 70 L.Ed. 750 (1926)
 
 
 [20]
 See text and accompanying footnote 21
 
 
 [21]
 One such test is an identity of legal and factual issues supporting the original claim and the counterclaim. A complete identity of legal and factual issues is, however, not required as demonstrated by the leading case of Moore v. New York Cotton Exchange, supra, wherein the Court retained jurisdiction over a counterclaim despite the dissimilarities in the legal and factual issues. "To hold otherwise would be to rob this branch of the rule of all serviceable meaning, since the facts relied upon by the plaintiff rarely, if ever, are, in all particulars, the same as those constituting the defendant's counterclaim." 270 U.S. at 610, 46 S.Ct. at 371. The test is of doubtful utility due to the problem of ascertaining what degree of factual and legal identity gives rise to a compulsory counterclaim
 A second test applied by courts is the Res judicata effect of a finding that the counterclaim is compulsory. This test is inadequate, however, due to the problems associated with the varying state interpretations of the doctrine of Res judicata.
 A third test relied upon by courts is the mutuality of evidence test, which, like the first test, does not require an absolute identity of proof.
 Still another test, and the most frequently applied, is the logical relationship test, having as its hallmark flexibility. This test, although often applied for its flexibility, results in uncertainty in application and tends to be overbroad in scope. See generally Wright & Miller, Federal Practice and Procedure : Civil § 1410 (1971).
 
 
 [22]
 A violation of the Securities and Exchange Acts of 1933 and 1934 occurred on the date the registration statement became effective. Plaintiffs acquired standing for a civil cause of action on the dates that they purchased Empire stock. (See note 1, Supra ). The proof necessary for the plaintiffs to establish a prima facie case consists of:
 (1) a material misstatement or omission; (2) lack of due care (Securities Act of 1933, 15 U.S.C. § 77a Et seq. (1970)); (3) reliance; (4) scienter (Securities and Exchange Act of 1934, 15 U.S.C. § 78a Et seq. (1970)); and (5) damage.
 Goldberg's claims, on the other hand, relate to the damages he allegedly suffered as a result of the publicity surrounding plaintiffs' suit and the judicial proceedings therein. Moreover, it cannot be said that Goldberg's claims advance the underlying purposes of the securities statutes.
 
 
 [23]
 The Securities Act of 1933 (15 U.S.C. § 77a Et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. § 78a Et seq.) were enacted to alleviate the abuses which had occurred in the securities market preceding the crash of 1929. One of the underlying purposes of the statutes was the elimination of the philosophy of caveat emptor and the creation of a higher standard of business ethics in the securities market. The legislation was also designed to eliminate the evils created by: short-swing trading by insiders, the lack of accurate information, loose margin requirements, and fraudulent market manipulation. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, Rehearing denied, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976); Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741, Rehearing denied, 407 U.S. 916, 92 S.Ct. 2430, 32 L.Ed.2d 692 (1972); Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). The purposes of the Acts were two-fold, i. e., (1) to provide investors with full disclosure of material information concerning public offerings of securities in commerce (1933 Act) and (2) to protect investors against manipulation of stock prices through the regulatory and reporting requirements imposed on companies whose stock is listed on national securities exchanges (1934 Act)
 
 
 [24]
 Goldberg also sought a reversal of Judge MacMahon's refusal to recuse himself but, in view of the result we reach on the merits, it is obviously quite unnecessary for us to consider whether the denial of the motion for recusal was a proper exercise of his discretion by the district judge