**BANCO PARA EL COMERCIO EXTERIOR DE CUBA, Plaintiff-Appellant,**

v.

**FIRST NATIONAL CITY BANK, Defendant-Appellee.**

**No. 106, Docket 80–7297.**

United States Court of Appeals, Second Circuit.

Originally Argued Jan. 26, 1981.

Decided Aug. 4, 1981.

Remanded from the United States Supreme Court June 17, 1983.

Reargued April 5, 1984.

Decided June 27, 1984.

Victor Rabinowitz, New York City (Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, on brief), for plaintiff-appellant.

Henry Harfield, New York City (John E. Hoffman, Jr., Jennifer Freeman, Shearman & Sterling, New York City, on brief), for defendant-appellee.

Before LUMBARD, VAN GRAAFEILAND, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge.

This case, in which Banco Para el Comercio Exterior de Cuba ("Bancec"), a former agency of the Cuban government, seeks to recover on a letter of credit issued by defendant First National City Bank ("Citibank"), and Citibank seeks to offset its losses from the expropriation of its Cuban branches by the Cuban government, returns to us on remand from the United States Supreme Court. In *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983), the Supreme Court reversed our decision, reported at

658 F.2d 913 (1981), which reversed on the basis of the act of state doctrine a judgment of the United States District Court for the Southern District of New York, Charles L. Brieant, Jr., *Judge,* dismissing the complaint. In an opinion reported *sub nom. Banco Nacional de Cuba v. Chase Manhattan Bank,* 505 F.Supp. 412 (S.D.N.Y.1980),[1] Judge Brieant dismissed Bancec's complaint on the ground that the amount it claimed was exceeded by the amount of Citibank's uncompensated losses resulting from the expropriation. The question now before us is the correctness of the court's determination as to the amount of Citibank's uncompensated losses. Bancec asserts that the court erred in accepting several of Citibank's claims of loss. We disagree and affirm the judgment.

## I. BACKGROUND

The history of the litigation and the events leading to it are set out in the opinions cited above, familiarity with which is assumed. It is now undisputed that the amount of Bancec's claim is $193,280. If Citibank suffered uncompensated losses totaling at least $193,280, its counterclaim offsets Bancec's claim. The district court found that Citibank had recovered $6,064,930 as compensation for the seizure of its Cuban properties. Bancec's claim was therefore properly dismissed if the value of Citibank's expropriated property exceeded $6,258,210, *i.e.,* the sum of Bancec's claim and Citibank's prior recoveries.

Judge Brieant determined that the value of the expropriated property exceeded $6,258,210, although he did not purport to determine the precise total value of the property. His principal finding was that the net asset value of Citibank's Cuban branches was $5,961,037:

> The August 23, 1960 statement of Citibank showed the net asset value of the Cuban branches to be $5,961,037.41. To this Citibank sought to add a write-up for the increase of market value over book value of land, building and contents, amounting to $1,700,000.

> Based on a review of the entire trial record, the Court is convinced that the books and records of Citibank's Cuban operations, regulated by authorities both American and Cuban, were, like those of Chase, regularly kept in a manner that was substantially correct and in accordance with law. Those books reflected the operations of the Cuban branches in accordance with generally accepted accounting principles consistently applied. The Court is also certain that there was some significant unrealized appreciation in excess of historical depreciated cost with respect to the real estate. The Court believes also that these branches had a good will value in excess of the total value of the assets necessarily devoted thereto. If Citibank's damages were to be computed in the same manner and on the same or similar theories of valuation, as the Court has computed the damages for Chase, the total net result of such a mathematical exercise would considerably exceed six million dollars.

> On the total record here, it would appear sufficient to make that finding.

505 F.Supp. at 466.

The court found that, in addition, Citibank had suffered a loss of $809,641 with respect to letters of credit issued by Citibank's New York office on behalf of customers of the Cuban branches (hereinafter "head office liabilities"). The expropriation left in the hands of the Cuban government the accounts payable on the letters of credit already paid. The court concluded that this amount was properly included in Citibank's counterclaim. *See id.* at 465.

Aggregating the $5,961,037 and the $809,641 (which total $6,770,678) and certain other smaller claims of loss, the court concluded that the value of the Citibank expropriated property exceeded $6,258,210. Accordingly, it dismissed Bancec's claim.

---

1. In that opinion the district court also decided claims between Banco Nacional de Cuba and Chase Manhattan Bank ("*Chase*" case). We affirmed the *Chase* decision, as modified, 514 F.Supp. 5 (S.D.N.Y.1980), in *Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875 (2d Cir.1981).

On appeal, Bancec contends principally that the court erred in its calculation of Citibank's losses because (1) the court considered the going concern value of the branches an allowable item of loss, (2) the net asset value figure improperly included a claimed loss of $772,331 for loans made to United States corporations which Citibank could have collected notwithstanding the expropriation; and (3) Citibank's claim of $809,641 for head office liabilities was barred by the statute of limitations.[2] We have considered all of Bancec's arguments and find no merit in any of them.

## II. DISCUSSION

### A. *Going Concern Value*

Bancec challenges the court's conclusion that Citibank's uncompensated losses exceeded the amount of Bancec's claim on the ground that the court believed Citibank was entitled to compensation for the going concern value of its expropriated Cuban branches. It argues that

[t]he determination by the court that additional findings of fact were "unnecessary" is based on its conclusion that the value of Citibank's property in Cuba was substantially in excess of the value put upon that property by plaintiff. This determination was based in large part by [*sic*] the view of the district court that going business value of the defendant's branches was an allowable item of loss (798). This court, in *Banco Nacional de Cuba v. Chase Manhattan Bank*, [658 F.2d 875 (2d Cir.1981)], held to the contrary.

(Bancec brief on remand at 4.) Bancec is correct that in *Chase* we ruled that the going concern value of a private foreign banking business in Cuba in 1960 was so speculative as to be an inappropriate basis for an award of damages. *See* 658 F.2d at 893–94. It is also clear from the district

court's opinion, 505 F.Supp. at 466, that the district court had believed that Citibank's Cuban branches had a substantial going concern value and that Citibank was entitled to be compensated for that value. The record makes it plain, however, that these views were not essential to the court's conclusion that Citibank's uncompensated losses exceeded Bancec's claim.

At the outset of its discussion of Citibank's claims of loss, the court noted that alternative valuation methods had been proposed with respect to the branches: one was an appraisal "on a 'going concern' basis," and the other was an appraisal "on a 'net worth' basis." 505 F.Supp. at 465. The going concern value was claimed to be $9,510,000. The net worth figure was $5,961,037. The court found that the latter figure was reflected in Citibank's records as the net asset value of its Cuban branches, and it found, "[b]ased on a review of the entire trial record," that those records were "substantially correct." *Id.* at 466. The fact that the court "also" believed "these branches had a good will value in excess of the total value of the assets necessarily devoted thereto," *id.*, does not affect its finding that the net asset value of the branches, which did not include a going concern valuation, was $5,961,037.

Accordingly, since Bancec's claim was properly dismissed if (a) the net asset value figure was correct and (b) the court properly allowed the head office liabilities, we conclude that the dismissal did not depend on the view that the branches had a compensable going concern value.

### B. *The Net Asset Value*

▇ Bancec contends that the $5,961,037 figure for the net asset value of the branches was overstated by at least $772,331, representing loans by Citibank to Unit-

---

**2.** Bancec also argues that Citibank overstated the value of the loan portfolio of its Cuban branches by $176,097, reflecting an allowance for bad debts, and that it overstated the value of the Cuban branches' real estate by $32,859. Since the total value of Citibank's losses as found by the district court was at least $6,770,- 678, or $512,568 more than the total of Bancec's claim plus Citibank's prior recoveries, the disputed amounts of $176,097 and $32,859 are, singly and in combination, too small to affect the outcome of this appeal. We therefore do not address these arguments.

ed States corporations which remained collectable by Citibank. There appears to be no dispute that the books of Citibank's Cuban branches showed loans totaling some $772,331 made to five borrowers that were United States corporations doing business in Cuba directly, rather than through Cuban subsidiaries. Bancec contends that these loans were not nationalized by the Cuban government, and that Citibank remains able to collect these debts in the United States and hence has not suffered any loss on these debts as a result of the expropriation. We disagree.

Notwithstanding these borrowers' nationality, the record showed that the borrowers were present in Cuba, and that the loans in question were made in Cuba, were made in pesos, and were to be repaid in Cuba. Bancec concedes as much; but it argues that the fact "[t]hat the loans were made in pesos and the debts payable in Cuba" is "irrelevant." (Bancec reply brief on remand at 5.) Far from being irrelevant, these facts make it plain that Citibank's right to collect these debts was an asset located in Cuba. See Chase decision, 505 F.Supp. at 453–54, affirmed in pertinent part, 658 F.2d at 894. The presence of the assets in Cuba is material because the Cuban expropriation decree directed at Citibank, inter alios, provided for the "nationalization, through forced expropriation, and the subsequent award to the State of Cuba, as sole owner, of all their property, rights, and stocks, particularly the banks and all their branches and agencies located in Cuba." Resolution No. 2 pursuant to Cuban Law No. 851 (as quoted in Bancec's brief on remand at 13 n. 4). Since these loans were located in Cuba, they were among the assets seized by the Cuban government.

We see no valid basis for Bancec's argument that "[a]ll that the nationalization decree affected was Citibank's right to seek collection from such assets as the debtors might have had in Cuba" (Bancec brief on remand at 16), or for its contention that if a borrower thereafter repaid loans to the Cuban banking agency it "would have been paying the loans to the wrong person" (Bancec reply brief on remand at 6). These arguments are squarely contradicted by the Cuban decree itself, which declared the State of Cuba to be the "sole owner" of the Citibank assets in Cuba.

■ Nor is there merit in Bancec's argument that Citibank should at least have tried to collect these debts in the United States, on the theory that it was unlikely that the borrowers repaid their loans to the Cuban banking agency after the expropriation of the Citibank branches. First, as Citibank points out, Cuba seized not only the assets of the Cuban branches but also seized all the evidences of indebtedness held by those branches. Thus, Citibank possesses neither the proof to establish its claims nor any records indicating that the loans have not already been collected by the Cuban government. More importantly, even if the loans were not repaid to the Cuban banking agency, the expropriation gave the Cuban government the right to collect them. The act of state doctrine prohibits courts of the United States from questioning Cuba's seizure of that right. See, e.g., Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 416, 84 S.Ct. 923, 934, 11 L.Ed.2d 804 (1964). A suit by Citibank to collect these loans, therefore, would inevitably have exposed the borrowers to the threat of double liability, a result the courts should seek to avoid. See, e.g., Harris v. Balk, 198 U.S. 215, 226, 25 S.Ct. 625, 628, 49 L.Ed. 1023 (1905).

The cases relied on by Bancec do not stand for the contrary proposition. For example, in Menendez v. Saks & Co., 485 F.2d 1355, 1369 (2d Cir.1973), rev'd on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), we allowed United States importers to recover on accounts receivable that had their situs in the United States. We emphasized that there was no evidence that the debtors "were present in Cuba or subject to the jurisdiction of Cuban courts at the time of the intervention," id. at 1365, and thus that allowing recovery did not present "the odi-

ous possibility of . . . double liability," *id.* Nor does *Vishipco Line v. Chase Manhattan Bank,* 660 F.2d 854 (2d Cir.1981), *cert. denied,* 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982), have any bearing on the issue before us. In that case, Chase had closed its Saigon branch and abandoned its physical assets there prior to (and in anticipation of) the Vietnamese government's confiscation decree. We held that Chase could not escape its liability to a depositor in the Saigon branch by virtue of that decree, for two reasons. First, the decree itself did not purport to reach Chase's intangible debts. Second, even if it had, it would be without legal effect under the act of state doctrine, since the debts ceased to have their situs in Vietnam when Chase closed its Saigon branch, and hence were outside Vietnam's territorial jurisdiction at the time of the decree. *Id.* at 862. There is nothing in *Vishipco* from which it may be implied that when a government purports to seize a bank's right to collect a loan, and that right still has its situs within the confiscating government's territorial jurisdiction at the time of seizure, the bank may collect it anyway.

In sum, the record established that in the present case the Cuban government seized the loans in question and had the right and power to collect them. Citibank thereby acquired a claim against the Cuban government for the value of those loans. Citibank had no obligation to attempt to mitigate its loss by asking the courts of the United States to impose double liability on the borrowers. We conclude that the district court's inclusion of the $772,331 representing those loans in the branches' net asset value was not improper.

### C. *The Head Office Liabilities*

Bancec challenges the district court's inclusion in Citibank's losses of the sum of $809,641 for liabilities undertaken by its New York office on behalf of customers of the Cuban branches, on the ground that the statute of limitations barred Citibank's claim for that loss. Bancec's premises are that this claim was not adequately asserted

in Citibank's original answer, which was served in 1961 prior to the running ·of the statute; and that the amendment to the answer allowed by the district court at trial in 1977 did not relate back to the date of the initial answer. We reject both propositions.

■ Citibank's original answer alleged that the Cuban government's expropriation deprived Citibank of property the reasonable value of which was "substantially in excess of the amount claimed in the complaint herein but at present indeterminable." (Answer ¶¶ 32, 36.) Fed.R.Civ.P. 8(a) and (e) require that a pleading be short, plain, and concise, and that it show that the pleader is entitled to relief. Rule 8(f) requires the court to construe all pleadings so as to do substantial justice. We view Citibank's original statement of its counterclaims as adequate to encompass its claim for head office losses caused by the Cuban expropriation of its Cuban branches.

■ Further, to the extent that the claimed head office loss should be considered first raised in the 1977 amended answer, we conclude that the counterclaim related back to the date of the original answer. Fed.R.Civ.P. 15(b) provides that

[i]f evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits.

Fed.R.Civ.P. 15(c) provides, in pertinent part, that

[w]henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

Notwithstanding these provisions, Bancec contends that since Citibank amended its

answer to assert an additional counterclaim, the amendment is governed by Fed. R.Civ.P. 13(f), the provision specifically covering omitted counterclaims, rather than by Rule 15(c), the more general provision covering amended pleadings. Rule 13(f) provides that "[w]hen a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, he may by leave of court set up the counterclaim by amendment." Bancec argues that since Rule 13 makes no provision for the relation back of a newly added counterclaim, Citibank's 1977 amendment did not relate back to the date of its original counterclaim. Although such a view has found support in some courts, *see, e.g., Stoner v. Terranella,* 372 F.2d 89 (6th Cir.1967), we disagree with it.

Rule 13(f) does not state that an amendment allowed pursuant thereto shall *not* relate back to the date of the original pleading; it is simply silent on the subject. But it is also silent as to other practices clearly allowable under Rule 15. For example, Rule 13(f) states that an omitted counterclaim may be added by amendment "by leave of court"; it is silent as to whether it may ever be added without leave of court. Yet we would not construe this silence to forbid the amendment of an answer, pursuant to Rule 15(a), to add a counterclaim within 20 days of the service of the answer without leave of court. *See* Fed.R.Civ.P. 15(a) ("A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served."); *A.J. Industries, Inc. v. United States District Court,* 503 F.2d 384, 388 (9th Cir.1974); 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1430, at 158–59 (1971).

The Federal Rules are to be construed so as to secure the just determination of every action, Fed.R.Civ.P. 1, and trial courts in this Circuit have accordingly ruled that a counterclaim amended pursuant to Rule 13(f) may relate back to the date of the original answer when the counterclaim arises out of the same transaction that was pleaded in the answer and there is no prejudice to the opposing party's ability to defend the merits of the counterclaim. *See Index Fund, Inc. v. Hagopian,* 91 F.R.D. 599, 604 (S.D.N.Y.1981); *Diematic Manufacturing Corp. v. Packaging Industries, Inc.,* 412 F.Supp. 1367, 1374 (S.D.N.Y. 1976). This practice is approved by the leading commentators. See 3 J. Moore, *Moore's Federal Practice* ¶ 13.33, at 13–200 n. 6 (2d ed. 1983); 6 C. Wright & A. Miller, *supra,* § 1430, at 159–60:

> To view [Rules 13(f) and 15] as mutually exclusive makes little sense ... in light of the express reference in Rule 13(f) to adding the omitted counterclaim "*by amendment.*" The better approach ... is to construe both rules together so that Rule 13(f) supplements the general provisions of Rule 15 by setting forth a particular standard for allowing the late assertion of omitted counterclaims. Once the standard set forth in Rule 13(f) is satisfied and leave of court to set up the omitted counterclaim by amendment has been granted, the remaining provisions of Rule 15 should be fully applicable and the amendment should relate back if it meets the test provided by Rule 15(c).

(Emphasis in original; footnote omitted.)

There is no question that Citibank's amendment met the test provided by Rule 15(c). The head office losses specified in the amended counterclaim arose out of the Cuban expropriation of Citibank's Cuban branches; losses from the expropriation were the subject of the original counterclaims; and Bancec has come forward with nothing to indicate that it was in any way prejudiced in its ability to defend Citibank's claim on its merits.

In the circumstances, we conclude that if the original answer did not adequately assert the claim for head office losses, the amended answer was justly allowed to relate back to the date of the original answer.

Bancec's statute of limitations defense was therefore properly rejected.

## CONCLUSION

We find no error in the district court's conclusion that Citibank suffered losses from the expropriation totaling at least $6,770,678. Since this exceeded by $512,-568 the amount of compensation Citibank had received for those losses, Bancec's claim for $193,280 was properly dismissed. The judgment of the district court is affirmed.