**Geoffrey S. RUBIN, as Trustee of the Southern Tier News Company Pension Plan, Plaintiff,**

v.

**VALICENTI ADVISORY SERVICES, INC., et al., Defendants.**

No. 03–CV–6201L.

United States District Court, W.D. New York.

June 16, 2006.

Donald W. O'Brien, Jr., Greta Katrin Kolcon, Woods Oviatt Gilman LLP, Rochester, NY, for Plaintiff.

Steven E. Cole, Laurie A. Giordano, Wolford & Leclair LLP, Rochester, NY, for Defendants.

## DECISION & ORDER

PAYSON, United States Magistrate Judge.

### PRELIMINARY STATEMENT

Plaintiff Geoffrey Rubin ("Rubin") filed suit on April 24, 2003, against defendants Valicenti Advisory Services, Inc. ("VAS") and Vincent Valicenti ("Valicenti") pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* (Docket # 1).

According to the Complaint, the Southern Tier News Company, Inc. established a defined benefit pension plan on or about July 1, 1979. (Docket # 1, ¶ 9). Rubin served as the trustee of the Southern Tier News Company, Inc. pension plan ("the Plan") (Docket # 1, ¶ 6); he is also a Plan beneficiary and the sole shareholder of the company-sponsor. On February 26, 2000, Rubin entered into an investment advisory agreement with VAS and Valicenti on behalf of the Plan. (Docket # 1, ¶ 10). At this time, Rubin also appointed VAS as attorney-in-fact and authorized a limited power of attorney to provide VAS and Valicenti full authority and discretion to manage assets of the Plan's account. (Docket # 1, ¶ 12). In February 2000, the entire balance of the Plan account was then transferred to defendants. (Docket # 1, ¶ 14).

According to Rubin, defendants acted as investment managers to the Plan and thus qualified as fiduciaries to the Plan as defined by ERISA. (Docket # 1, ¶ 18). Defendants were provided with documentation regarding services rendered to the Plan by the prior investment management company and were made aware that the Plan was over-funded by approximately 10%. (Docket # 1, ¶ 15). Rubin also purportedly informed defendants that he did not want them to utilize an investment strategy that would place more than 10% of the assets at risk (the amount by which the Plan was then over-funded). (Docket # 1, ¶ 16).

Rubin alleges that under the management of defendants, the vast majority of the Plan's account became and remained overly-concentrated in technology or technology-related investments, including high-risk investments not appropriate for a pension plan account. (Docket # 1, ¶¶ 25–26). According to Rubin, by September 30, 2002, the value of the Plan's account had diminished by a degree drastically disproportionate to any comparable benchmark. (Docket # 1, ¶ 28). Shortly thereafter, as a result of defendants' alleged mismanagement and their refusal to meet with Rubin, Rubin terminated defendants' services as investment manager to the Plan. (Docket # 1, ¶ 29).

On July 18, 2003, defendants filed an answer and interposed counterclaims against Rubin for contribution and indemnity, alleging that the losses suffered by the Plan were caused by the breach of Rubin's own fiduciary duties as plan trustee. (Docket # 2). By Decision and Order dated July 19, 2004, the Hon. David G. Larimer, United States District Judge, granted Rubin's motion to dismiss the counterclaims and granted defendants' cross-motion for leave to file a third-party action against Rubin in his individual capacity. (Docket # 33). Like the dismissed counterclaims, the third-party complaint asserts claims for indemnification and contribution against Rubin personally, alleging that Rubin himself was responsible for the investment decisions that caused the Plan's losses. (Docket # 34). According to defendants, Rubin managed the Plan's account and directed the transactions therein in the same manner as he managed his personal accounts, which were also held with VAS at the time. (Docket # 34, ¶¶ 78–79). They further allege that Rubin managed both accounts to advance his personal financial interests, at the expense of the Plan's interests. (Docket # 34, ¶ 82).

Rubin answered the third-party complaint on September 10, 2004. (Docket # 35). Rubin now seeks to amend his answer to include counterclaims relating to defendants' alleged mismanagement of his personal account. (Docket # 76).

## I. MOTION TO AMEND

### DISCUSSION

Rubin moves for leave to amend his answer to defendants' third-party complaint to add counterclaims against VAS and Valicenti for: (1) professional malpractice; (2) breach of contract; and (3) fraud. (Docket # 76, Ex. E (Proposed Amended Answer)). Defendants oppose the motion, claiming that the amendment is futile because the applicable statutes of limitations for the proposed counterclaims have expired. (Docket # 82).

**A. Leave to Amend Should Be Freely Given:** Rule 15(a) of the Federal Rules of Civil Procedure provides that once the time for amending a pleading as of right has expired, a party may request leave of the court to amend, which "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). If the underlying facts or circumstances relied upon by the party seeking leave to amend may be a proper subject of relief, the party should be afforded the opportunity to test the claim on its merits. *See United States ex rel. Maritime Admin. v. Continental Illinois Nat. Bank and Trust Co. of Chicago*, 889 F.2d 1248, 1254 (2d Cir. 1989). "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). *See also Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 333 (2d Cir.) ("[p]arties are generally allowed to amend their pleadings absent bad faith or prejudice"), *cert. denied*, 531 U.S. 979, 121 S.Ct. 427, 148 L.Ed.2d 436 (2000).

While the court retains discretion to grant or deny leave to amend under Rule 15(a), "[the] outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. at 182, 83 S.Ct. 227; *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993); *Evans v. Syracuse City School Dist.*, 704 F.2d 44, 46 (2d Cir.1983).

**B. Futility of Proposed Amendment:** Notwithstanding the generally lenient standard for permitting amendments, it is also well-settled that if the amendment proposed by the moving party is futile, "it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d at 131. In examining whether the claims sought to be asserted in the amended pleading are futile, the court must determine whether or not the amended pleading fails to state a claim for relief or would be subject to a motion to dismiss on some other basis. *See, e.g., S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Housing Dev. Fund Co., Inc.*, 608 F.2d 28, 42 (2d Cir.1979); *McNally v. Yarnall*, 764 F.Supp. 853, 855 (S.D.N.Y. 1991). Under Fed.R.Civ.P. 12(b)(6), a claim must be dismissed if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied*, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994). In order to withstand a motion under Rule 12(b)(6), the complaint "must assert a cognizable claim and allege facts that, if true, would support such a claim." *Boddie v. Schnieder*, 105 F.3d 857, 860 (2d Cir.1997).

Defendants argue that Rubin's proposed amendment would be futile because the counterclaims are barred by the applicable statutes of limitations. (Docket ## 82, 89). Rubin, on the other hand, argues that the counterclaims are compulsory counterclaims and, as such, tolled the statute of limitations at the time the third-party complaint was filed, thus bringing the counterclaims within the statutory period. (Docket ## 84, 90). Accordingly, the initial issue to be addressed

by this Court is whether Rubin's proposed counterclaims should be considered compulsory or permissive.

**C. Compulsory Counterclaims Arise Out of Same Transaction:** Under Rule 13(a) of the Federal Rules of Civil Procedure:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Fed.R.Civ.P. 13(a). Pursuant to Rule 13(f), "When a pleader fails to set up a counterclaim through oversight, inadvertence or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment." Fed.R.Civ.P. 13(f).

■ To determine whether a counterclaim arises out of the same transaction as the original claim, the court must assess the logical relationship between the two claims, see, e.g., United States v. Aquavella, 615 F.2d 12, 22 (2d Cir.1980) (citing Koufakis v. Carvel, 425 F.2d 892, 899 (2d Cir.1970)), and determine whether the " 'essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.' " Id. (quoting Harris v. Steinem, 571 F.2d 119, 123 (2d Cir.1978)). When making this determination, the Second Circuit "has taken a broad view, not requiring 'an absolute identity of factual backgrounds ... but only a logical relationship between them.' " Id. (quoting United Artists Corp. v. Masterpiece Productions, 221 F.2d 213, 216 (2d Cir.1955)).

■ In this matter, the original complaint filed by Rubin as trustee of the Plan alleges that VAS and Valicenti mismanaged the Plan's account and violated their fiduciary duties under ERISA. (Docket # 1). Defendants allege in their third-party complaint that although Rubin hired them to manage the Plan and signed an agreement providing defendants with discretionary authority over it, Rubin misrepresented material facts about the Plan and improperly directed defendants concerning their handling of the account. (Docket # 34, ¶¶ 74–78). Specifically, defendants assert that Rubin is an experienced and sophisticated investor who opened a personal account with defendants at approximately the same time as the Plan account was opened.[1] (Docket # 34, ¶¶ 73, 79). According to defendants, Rubin made similar trades and held many of the same investments in his personal account that he challenges as inappropriate in the Plan's account. (Docket # 34, ¶ 79). Defendants further argue that Rubin's interest as Plan trustee conflicted with his personal financial interests as a beneficiary of the Plan and as president and sole shareholder of the company (the Plan's sponsor). (Docket # 34, ¶¶ 73–82). Thus, the third-party complaint alleges, any mismanagement of the Plan was caused by Rubin's breach of his own fiduciary duties as Plan trustee. (Docket # 35, ¶¶ 82–85).

In his proposed counterclaims to the third-party complaint, Rubin alleges that at the same time that he consulted with defendant regarding the Plan's account, he also consulted with them regarding his personal account. (Proposed Amended Answer, ¶ 41). Rubin decided to invest with defendants based upon their alleged representations that they would purchase on his behalf only "low-risk," "blue-chip" stocks from companies with a "good track record." (Proposed Amended Answer, ¶ 45). Notwithstanding such representations, Rubin submits, defendants "failed to properly diversify his personal account holdings and otherwise acted in a negligent and imprudent manner" (Proposed Amended Answer, ¶ 51) and failed to provide information regarding the status of the account to Rubin upon request (Proposed Amended Answer, ¶ 53). As a result of these failures, the value of Rubin's personal account decreased dramatically, just as the Plan's account did. (Proposed Amended Answer, ¶¶ 48, 54).

---

**1.** Indeed, Rubin affirms that the accounts were in fact opened on the same day pursuant to a single investment advisory services agreement. (Docket # 85, ¶ 5).

At first blush, Rubin's counterclaims concerning the alleged mismanagement of his personal account do not appear to be factually or legally related to his original complaint brought as Trustee on behalf of the Plan's account. It must be remembered, however, they are raised as counterclaims to defendants' third-party complaint and must be viewed in that context. Defendants have countered Rubin's original allegations that they mismanaged the Plan's account with their contention that Rubin had two accounts, one personal and one as Plan trustee, and that he overrode defendants' efforts to manage both accounts and controlled them together as part of a single investment objective to further his own personal interests. To support their contention, defendants have sought information through discovery concerning Rubin's personal financial information, and those efforts have resulted in several discovery motions filed with this Court. (*See* Docket ## 40, 53, 68). In other words, defendants have placed at issue Rubin's interactions—including directions to and consultations and communications with—defendants concerning both his personal account and the Plan's account.

Rubin now seeks to add counterclaims against defendants for professional malpractice, breach of contract and fraud relating to his personal account. Although these claims are legally distinct from defendants' third-party claims, the plain language of Rule 13 requires the court to consider principally the factual overlap between the claims and counterclaims, not their legal similarities. *See* Fed.R.Civ.P. 13(a) (compulsory counterclaim is "any claim which at the time of serving the pleading the pleader has against any opposing party, if it is arises out of the transaction or occurrence that is the subject matter of the opposing party's claim"). The focus of the rule is on judicial economy, which is promoted when all legal claims arising out of the same factual scenario are presented to a single jury. *See Harris v. Steinem,* 571 F.2d at 123 (court must determine whether "essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that the issues be resolved in one lawsuit"). On this record, I find that a logical factual relationship exists between defendants' third-party complaint and the counterclaims sought to be asserted by Rubin.

Despite the clear language from the Second Circuit that the connection between claims and counterclaims should be viewed broadly, *see United Artists Corp. v. Masterpiece Productions,* 221 F.2d at 216, defendants argue that, in practice, courts have adopted a more narrow interpretation of the rule. Defendants cite three cases in support of this proposition, two of which I find clearly distinguishable from the matter at hand. As to the third, a district court decision from outside this district, I question its reasoning and, for that reason, do not find its conclusion persuasive.

First, defendants cite *Jones v. Ford Motor Credit Co.,* 358 F.3d 205 (2d Cir.2004). In that case, the plaintiff filed a class-action suit for racial discrimination under the Equal Credit Opportunity Act, alleging that the defendant's automotive financing plan discriminated against African–Americans by charging them higher rates than similarly-situated Caucasian customers. *Id.* at 207. In its answer, the defendant denied the allegations and asserted state law counterclaims against any member of the plaintiff class who was in default on a car loan from the defendant. *Id.* at 208. The Second Circuit held that the counterclaims were permissive, not compulsory counterclaims because the plaintiffs' complaint concerned the company's policy of marking-up credit terms in the financing contract, while the "debt collection" counterclaims concerned events occurring entirely subsequent to the execution of the financing contract. *Id.* at 209.

Defendants' also rely on *Federman v. Empire Fire and Marine Ins. Co.,* 597 F.2d 798 (2d Cir.1979), a securities fraud class action suit brought by purchasers of shares of common stock of Empire Fire and Marine, Ins. ("Empire") during a public offering. The plaintiffs alleged federal securities fraud claims based upon Empire's failure to disclose in its registration statement and prospectus its agreement to pay a $200,000 finder's fee to the law firm retained to prepare those documents. *Federman v. Empire Fire*

*and Marine Ins. Co.,* 597 F.2d at 801. One of the defendants, an attorney with the firm, asserted state law counterclaims and cross-claims for injurious involvement and fraud against Empire and the law firm, claiming that they had intentionally withheld material information from him and thus had misled him into issuing an erroneous opinion about the company's disclosure obligations in the challenged documents. As a result of those actions and the subsequent publicity surrounding the lawsuit, he maintained, his reputation suffered substantial damage. *Id.* at 806–807.

The Second Circuit held that the attorney's counterclaims were not compulsory and thus were not automatically within the scope of the court's ancillary jurisdiction.[2] *Id.* at 812. Noting that the claims "bear some factual relationship to the original claim for securities fraud," the court nonetheless concluded that they did not arise out of the same transaction or occurrence.[3] *Id.* In reaching this determination, the court emphasized that the tort counterclaims "go far beyond the purview of the [securities] claims," resolution of them would require a more substantial quantum of proof than the securities claims and the factual bases of the counterclaims "concern[ ] primarily events subsequent and unrelated to the alleged omissions in the registration statement and prospectus." *Id.*

Having carefully considered the third case relied upon by defendants, *Spencer v. Banco Real, S.A.,* 623 F.Supp. 1008 (S.D.N.Y.1985), I hesitate to adopt its reasoning. There, the plaintiff filed claims for discrimination and retaliation against her former employer, a bank, alleging, *inter alia,* that she was terminated in retaliation for having filed charges with the Equal Employment Opportunity Commission and New York State Division of Human Rights. In a separate action filed in state court, the bank sued the plaintiff, asserting claims for, *inter alia,* conversion, breach of fiduciary duty and trespass based upon her alleged wrongful appropriation of confidential bank documents—which, according to the bank, was the reason she was terminated. *Spencer v. Banco Real, S.A.,* 623 F.Supp. at 1010–1011. Despite the parties' desire to consolidate the claims in the state action with those in the federal action, the court determined that it did not have ancillary jurisdiction over the state claims because they did not arise from the same transaction or events. *Id.* at 1011–12.

On the facts as I understand them from the opinion, I question that conclusion because the crux of both claims is the question of the genuine reason for plaintiff's termination—whether it was a retaliatory act for having filed EEOC charges or whether it was a proper imposition of discipline for having misappropriated confidential bank information. In addition, the plaintiff's federal retaliation claim was also based upon the bank's initiation of the state lawsuit; thus, the merits of the state claims would be relevant, if not critical, to a determination of the federal retaliation claim. For these reasons, I decline to accord any significant weight to the *Spencer* decision.

Unlike the counterclaims at issue in *Jones* and *Federman,* the proposed counterclaims in this case bear a logical relationship to the third-party claims asserted by defendants. That logical relationship derives from their substantial factual and chronological overlap. Rubin's agreement with defendants to manage his personal account was executed the same day as the Plan's management agreement; indeed, they were apparently reflected in a single investment advisory services agreement form. (Docket # 85, ¶ 5). Both accounts provided identical discretionary authority to defendants. According to defendants, Rubin impeded their management of the accounts by withholding information from them and by directing trades on both ac-

---

2. The court noted that its analysis also applied to the cross-claims against the law firm because the test for determining whether a court has ancillary jurisdiction over cross-claims and counterclaims is the same as the test for determining whether counterclaims are compulsory. *Id.* at 811.

3. Notably, the court drew a different conclusion concerning Empire's cross-claims against the law firm and its general partners for contribution, indemnity and damages, stating that they "arose out of the same transaction that was the subject matter of the original complaint." *Id.* at 811.

counts as part of a single investment strategy designed to further his personal interests. Indeed, defendants have successfully moved to compel disclosure of information pertaining to Rubin's personal investment accounts, including his personal accounts with defendants, on the grounds that such information is relevant to their third-party claims.

On this record, which already encompasses discovery relating to defendants' management of Rubin's personal accounts and Rubin's alleged interference into that management, I find that Rubin's claims arising from the defendant's agreement to manage his personal accounts arise out of the same transactions or occurrences on which defendants' third-party claims for indemnity and contribution are based (although they are plainly legally distinct). Accordingly, I find that they are compulsory counterclaims under Rule 13(a).[4] *See, e.g., Adam v. Jacobs,* 950 F.2d 89, 92 (2d Cir.1991) (finding that claims for enforcement of contract should have been filed as compulsory counterclaims to original claims seeking rescission of contract on grounds that it was induced by fraud); *Andre v. Schenectady County,* 1997 WL 135910 (N.D.N.Y.1997) (finding compulsory the claim by the defendant correctional officer for alleged assault by plaintiff-prisoner on the day preceding the alleged assault by officer against plaintiff that gave rise to the plaintiff's lawsuit); *see also Critical–Vac Filtration Corp. v. Minuteman Int'l, Inc.,* 233 F.3d 697, 700–701 (2d Cir.2000) (holding that claims for knowingly enforcing an invalid patent should have been raised as compulsory counterclaims in prior case for patent infringement), *cert. denied,* 532 U.S. 1019, 121 S.Ct. 1958, 149 L.Ed.2d 754 (2001); *Sage Realty Corp. v. Insurance Co. of North America,* 34 F.3d 124, 129 (2d Cir.1994) (claim for unpaid rent and compulsory claim

for calculation of additional rent and expenses pursuant to lease arose out of same transaction); *Kristensons–Petroleum, Inc. v. Sealock Tanker Co., Ltd.,* 304 F.Supp.2d 584, 588 (S.D.N.Y.2004) (finding "close logical relationship" between plaintiff's breach of maritime contract claim for failure to pay fuel supply costs and defendant's counterclaims for declaratory judgment that plaintiff did not have authority to arrest vessel as result of alleged failure to pay); *Nordco, A.S. v. Ledes,* 1999 WL 1243883, *5 (S.D.N.Y.1999) (counterclaims for tortious interference with contract were deemed compulsory to claims of trademark infringement where tort claims were allegedly motivated by perceived infringement).

■ **D.** ***Proposed Counterclaims Are Timely:*** Having found that Rubin's proposed counterclaims are compulsory, this Court must now address the timeliness of such claims to determine whether assertion of them would be futile, as defendants assert.

When analyzing the appropriateness of a motion to amend under Federal Rule 15, the question of timeliness is generally distinct from the legal analysis of the claims. Here, however, the question of timeliness effectively conflates with the determination whether the proposed claims are compulsory under Rule 13(a). Both rules look to whether the new claims arise out of the same transaction as that in the original pleading.[5] Indeed, the Second Circuit has specifically approved the practice of construing together Rules 13 and 15 when determining whether to allow the amendment of an otherwise untimely counterclaim. *See Banco Para El Comercio Exterior De Cuba v. First Nat'l City Bank,* 744 F.2d 237, 243 (2d Cir.1984).

> To view Rules 13(f) and 15 as mutually exclusive makes little sense . . . in light of the express reference in Rule 13(f) to add-

---

4. I also find that the requirements of Rule 13(f) have been satisfied and that the interests of justice require that leave be permitted to assert the compulsory counterclaims by amendment. Unfortunately, much of the delay in moving this case forward has resulted from discovery disputes concerning whether Rubin should be compelled to produce information about his personal finances. This decision should foreclose any further disputes of that nature. Because little discovery has actually been conducted thus far, I

find that the defendants have not been prejudiced by the tardy assertion of these counterclaims.

5. Rule 15(c)(2) provides that an amendment of a pleading relates back to the date of the original pleading when "the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading." Fed.R.Civ.P. 15(c)(2).

ing the omitted counterclaim "by *amendment*." The better approach ... is to construe both rules together so that Rule 13(f) supplements the general provisions of Rule 15 by setting forth a particular standard for allowing the late assertion of omitted counterclaims. Once the standard set forth in Rule 13(f) is satisfied and leave of court to set up the omitted counterclaim by amendment has been granted, the remaining provisions of Rule 15(c) should be fully applicable and the amendments should relate back if it meets the test provided by Rule 15(c).

*Id.* at 243 (quoting 6 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* § 1430 at 159–60 (1971)); *see also Andre v. Schenectady County,* 1997 WL 135910 at *2 ("If defendant['s][ ] proposed counterclaims are considered compulsory counterclaims, they would not be barred by the statute of limitations").

Here, the statutes of limitations applicable to Rubin's claims for professional malpractice and breach of contract are three years, *see* N.Y. C.P.L.R. § 214(6) (McKinney 2003), and the statute of limitations applicable to a claim of fraud is six years, *see* N.Y. C.P.L.R. § 213(8) (McKinney 2003).[6] Rubin alleges in his complaint that by September 30, 2002, the value of the Plan's account had "reduced drastically disproportionate to any comparable benchmark." (Docket # 1, ¶ 28). Thus, it appears that the statute of limitations began to run in September 2002, and defendants have not argued otherwise. *(See* Docket # 82 at 7). The third-party complaint was filed by defendants less than two years later on July 28, 2004. (Docket # 34). Reading Rules 13 and 15 together, and because I find that Rubin's proposed counterclaims and the third-party complaint arise

out of the same transactions and occurrences, the counterclaims therefore relate back to the filing of the third-party complaint on July 28, 2004, and thus are not barred by the applicable statute of limitations.[7] Accordingly, Rubin's proposed counterclaims are timely, and his motion to amend his answer to include such counterclaims is not futile.

## II. MOTION FOR RECONSIDERATION

Also pending before this Court is a motion by defendants for reconsideration of this Court's previous orders dated November 3, 2005 and March 14, 2005. (Docket # 68). Those orders, *inter alia,* provided that certain information pertaining to Rubin's net worth and personal investments be disclosed to defendants' attorneys only, and not to defendants. In view of this decision, I grant the motion for reconsideration and rescind the provision of those earlier orders prohibiting disclosure of such information to defendants. Such disclosure shall only be permitted, however, after defendants execute a confidentiality agreement prohibiting the use or disclosure of such information for any purpose unrelated to this litigation.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for leave to amend his answer to defendant's Third–Party Complaint (**Docket # 76**) is **GRANTED.** Defendant's motion for reconsideration of this Court's March 14, 2005 and November 3, 2005 Orders (**Docket # 68**) is **GRANTED.**

**IT IS SO ORDERED.**

---

6. Defendants argue that a three year statute of limitations should apply to Rubin's fraud claim because it is incidental to the other two claims asserted. (Docket # 82 at 6). I need not resolve that question, however, because I find that the claim is timely whether governed by a three or six-year limitations period.

7. Some authority exists to suggest that the initiation of a lawsuit or, in this case, the third-party complaint serves to toll the statute of limitations for purposes of a compulsory counterclaim. *See*

*Burlington Indus. v. Milliken & Co.,* 690 F.2d 380, 389 (4th Cir.1982) ("the better view holds that 'the institution of plaintiff's suit tolls or suspends the running of the statute of limitations governing a compulsory counterclaim' ") (quoting 6 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* § 1419 at 109 (1971)); *Andre v. Schenectady County,* 1997 WL 135910 at *2 (same). Whether analyzed as a question of tolling or relation-back, the result here is the same (as it likely would be in most cases).